# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

IPA TECHNOLOGIES INC.,

        Plaintiff,

v.

MICROSOFT CORPORATION,

        Defendant.

C.A. No. 1:18-cv-00001-RGA-SRF

**Public Version Filed: 11/29/23**

## BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND *DAUBERT*

Dated: November 22, 2023

Of Counsel:

Paul J. Skiermont
Jaime K. Olin
Steven W. Hartsell
Kevin P. Potere
Todd A. Martin
SKIERMONT DERBY LLP
1601 Elm Street, Suite 4400
Dallas, TX 75201
(214) 978-6600
pskiermont@skiermontderby.com
jolin@skiermontderby.com
shartsell@skiermontderby.com
kpotere@skiermontderby.com
tmartin@skiermontderby.com

Mieke K. Malmberg
SKIERMONT DERBY LLP
633 West 5th Street, Suite 5800
Los Angeles, CA 90071
(213) 788-4500
mmalmberg@skiermontderby.com

BAYARD, P.A.

Stephen B. Brauerman (#4952)
600 North King Street, Suite 400
Wilmington, DE 19801
(302) 655-5000
sbrauerman@bayardlaw.com

*Attorneys for Plaintiff,*
*IPA Technologies Inc.*

**TABLE OF CONTENTS**

I.    SUMMARY OF THE ARGUMENTS ................................................................. 1

II.   NATURE AND STAGE OF THE PROCEEDING ............................................ 2

III.  IPR ESTOPPEL PRECLUDES MICROSOFT AND ITS EXPERT FROM
      RELYING ON PRINTED PUBLICATIONS TO ADVANCE INVALIDITY
      THEORIES ....................................................................................................... 2

      A.   Background ............................................................................................ 2

           1.   IPA's prior requests to strike........................................................ 2

           2.   District court litigation and IPRs................................................. 3

      B.   IPR Estoppel Is Applied Broadly ........................................................ 5

      C.   Microsoft Should Be Precluded From Relying on Publications at Trial,
           Including Those That Comprise the Alleged CNET OAA and RETSINA
           Systems .................................................................................................. 9

           1.   Microsoft could have relied on the Martin Paper in its IPRs..... 9

           2.   Printed publications that Microsoft seeks to combine as alleged
                "System Art" to evade IPR estoppel should be excluded ......... 10

IV.   THE COURT SHOULD EXCLUDE CERTAIN OPINIONS OF DR. SYCARA........... 14

      A.   Dr. Sycara Cannot Opine on the Public Availability of SRI Code or
           Functionality Allegedly Shown at any SRI Demonstration ................. 16

      B.   Dr. Sycara's Inventorship Opinions Must be Excluded ...................... 20

V.    MICROSOFT DEFAULTED ON ITS *ARCTIC CAT* BURDEN OF
      PRODUCTION BY FAILING TO IDENTIFY SPECIFIC PRODUCTS IT
      CONTENDS ARE CAPABLE OF MARKING BUT WERE NOT MARKED............. 21

      A.   Factual Background ............................................................................. 21

      B.   Microsoft Defaulted on its *Arctic Cat* Burden of Production .............. 22

           1.   Microsoft did not ███████████████████████
                Microsoft believes and alleges should have been marked with the
                Asserted Patents ......................................................................... 22

2.    Microsoft did not identify any other specific tangible product it
believes should have been marked ............................................................ 25

VI.    ALTERNATIVELY, IPA'S SECOND AMENDED COMPLAINT RELATES
BACK TO THE FILING DATE OF IPA'S ORIGINAL COMPLAINT
(01/01/2018).................................................................................................... 26

A.    The Federal Rules and Binding Precedent Establish that IPA's SAC Relates
Back to the Filing Date of the Original Complaint ................................................ 26

B.    All of the *Anza* Factors Support Application of the Relation-Back Doctrine
from Original Complaint to the SAC in this Case ................................................. 28

1.    *Anza* Factor 1: Overlap of parties............................................. 28

2.    *Anza* Factor 2: Overlap of accused products and processes...................... 28

3.    *Anza* Factor 3: Overlap in technology...................................... 30

4.    *Anza* Factor 4: Overlap in time periods.................................... 31

5.    *Anza* Factor 5: Additional considerations ................................. 32

VII.    THE COURT SHOULD EXCLUDE DR. BECKER'S FLAWED REASONABLE
ROYALTY CALCULATIONS BASED ON ███████████████
██.................................................................................................................... 32

VIII.   THE COURT SHOULD EXCLUDE DR. LIEBERMAN'S AND DR. BECKER'S
OPINIONS CONCERNING NON-INFRINGING ALTERNATIVES........................... 35

IX.    CONCLUSION ................................................................................................. 40

# TABLE OF AUTHORITIES

**CASES**

*360 Mortgage Group, LLC v. Homebridge Fin. Services, Inc.*,
No. A-14-CA-00847-SS, 2016 WL 6075566 (W.D. Tex. Apr. 22, 2016) ..................................32

*Akamai Techs., Inc. v. Limelight Networks, Inc.*,
No. 06-11109-RWZ, 2008 WL 697703 (D. Mass. Feb. 8, 2008)..........................................5, 23

*Altair Logix LLC v. Asus Computer Int'l*,
18-CV-04985-HSG, 2019 WL 1117535 (N.D. Cal. Mar. 11, 2019) ..........................................24

*Am. Med. Sys., Inc. v. Med. Eng'g Corp.*,
6 F.3d 1523 (Fed. Cir. 1993) ..................................................................................................23

*Anza Tech., Inc. v. Mushkin, Inc.*,
934 F.3d 1369 (Fed. Cir. 2019) ...........................................................................27, 29, 30, 32

*ART+COM Innovationpool GmbH v. Google Inc.*,
155 F. Supp. 3d 489 (D. Del. 2016) ......................................................................................20

*Barber v. United Airlines, Inc.*,
17 Fed. Appx. 433 (7th Cir. 2001..........................................................................................33

*Biscotti Inc. v. Microsoft Corp.*,
No. 2:13-CV-01015-JRG-RSP, 2017 WL 2526231 (E.D. Tex. May 11, 2017) ..........................8

*Bridgestone Sports Co. v. Acushnet Co.*,
No. CIVA 05-132 JJF, 2007 WL 521894 (D. Del. Feb. 15, 2007)............................................37

*Cal. Inst. of Tech. v. Broadcom Ltd.*,
25 F.4th 976 (Fed. Cir. 2022) ...................................................................................................5

*Cobalt Boats, LLC v. Sea Ray Boats, Inc.*,
No. 2:15-cv-21, 2017 WL 2605977 (E.D. Va. June 5, 2017).....................................................9

*CXT Systems, Inc. v. Academy LTD*,
No. 2:18-CV-00171-RWS-RSP, 2020 WL 9936135 (E.D. Tex. Jan. 28, 2020).......................25

*ePlus, Inv. V. Lawson Software, Inc.*,
700 F.3d 509 (Fed. Cir. 2012) ...............................................................................................33

*Freeny v. Murphy Oil Corp.*,
No. 2:13-CV-791-RSP, 2015 WL 5144347 (E.D. Tex. June 4, 2015)......................................39

iv

*Grain Processing Corp. v. Am. Maize Products*,
185 F.3d 1341 (Fed. Cir. 1999) ............................................................................39

*GREE, Inc. v. Supercell Oy*,
No. 2:19-CV-00071-JRG-RSP, 2020 WL 4999689 (E.D. Tex. July 9, 2020)............................11

*Guile v. United States*,
422 F.3d 221 (5th Cir. 2005) ............................................................................34

*Guzman v. State Farm Lloyds*,
456 F. Supp. 3d 846 (S.D. Tex. Apr. 27, 2020) ........................................................33

*Hangarter v. Provident Life & Acc. Ins. Co.*,
373 F.3d 998 (9th Cir. 2004) ............................................................................15

*In re Wyer*,
655 F.2d 221 (C.C.P.A. 1981) ...................................................................12, 14, 19

*Innogenetics, N.V. v. Abbott Lab'ys*,
512 F.3d 1363 (Fed. Cir. 2008) ............................................................................39

*Innogenetics, N.V. v. Abbott Labs.*,
512 F.3d 1363 (Fed. Cir 2008) ............................................................................36

*IOENGINE, LLC v. PayPal Holdings, Inc.*,
607 F. Supp. 3d 464 (D. Del. 2022) ..........................................................................7

*Ironburg Inventions Ltd. v. Valve Corp.*,
64 F.4th 1274 (Fed. Cir. 2023) ............................................................................13

*Johns Hopkins Univ. v. Alcon Lab'ys, Inc.*,
No. CV 15-525-SLR-SRF, 2018 WL 11424700 (D. Del. Apr. 5, 2018) ...................................38

*Knauf Insulation, LLC v. Johns Manville Corp.*,
No. 115CV00111TWPMJD, 2023 WL 2769088 (S.D. Ind. Mar. 30, 2023)............................21

*Konstantopoulos v. Westvaco Corp.*,
112 F.3d 710 (3d Cir. 1997) ............................................................................37

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999)............................................................................34

*Lake Cherokee Hard Drive Techs., L.L.C. v. Marvell Semiconductor, Inc.*,
964 F. Supp. 2d 653 (E.D. Tex. 2013)............................................................................26

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
No. 2:06- CV-348, 2011 WL 197869 (E.D. Tex. Jan. 20, 2011)..............................................39

*Limelight Networks, Inc. v. XO Communications, LLC*,
 241 F. Supp. 3d 599 (E.D. Va. 2017) ...................................................................23

*Lust v. Merrell Dow Pharms.*,
 89 F.3d 594 (9th Cir. 1996) ...............................................................................33

*Medtonic Inc. v. Barry*,
 IPR2015-00780, Paper 51 (PTAB Sept. 7, 2016) ..................................................12

*Medtronic, Inc. v. Barry*,
 891 F.3d 1368 (Fed. Cir. 2018) .........................................................................12

*Novartis Pharms. Corp. v. Par Pharm. Inc.*,
 No. CV 14-1289-RGA, 2019 WL 9343055 (D. Del. Apr. 11, 2019) ..........................6

*Parallel Networks Licensing, LLC v. Int'l Bus. Machines Corp.*,
 No. CV 13-2072 (KAJ), 2017 WL 1045912 (D. Del. Feb. 22, 2017)...........................6

*Pavo Sols. LLC v. Kingston Tech. Co., Inc*,
 No. 8:14-CV-01352-JLS-KES, 2019 WL 4390573 (C.D. Cal. June 26, 2019) .........................25

*Pavo Sols. LLC v. Kingston Tech. Co., Inc.*,
 No. 8:14-CV-01352-JLS-KES, 2019 WL 8138163 (C.D. Cal. Nov. 20, 2019) .........................39

*Prism Techs., LLC v. T-Mobile USA Inc.*,
 No. 12-124, 2015 WL 5883764 (D. Neb. Oct. 8, 2015) ...........................................39

*Securities and Exchange Commission v. Tourre*,
 950 F. Supp. 2d 666 (S.D.N.Y. 2013).................................................................21

*Semcon IP Inc. v. MediaTek Inc.*,
 2018 WL 4501871 (E.D. Tex. Feb. 28, 2018).........................................................36

*Shure Inc. v. ClearOne, Inc.*,
 No. CV 19-1343-RGA-CJB, 2020 WL 8258362 (D. Del. June 18, 2020) ...............................28

*Shure Incorporated & Shure Acquisition Holdings, Inc., v. ClearOne, Inc.*,
 No. CV 19-1343-RGA-CJB, 2020 WL 2839294, (D. Del. June 1, 2020) ..............27, 28, 31, 32

*Singular Computing LLC v. Google LLC*,
 No. CV 19-12551-FDS, 2023 WL 2839282 (D. Mass. Apr. 6, 2023)............................... passim

*Sioux Steel Co. v. Prairie Land Mill Wright Servs.*,
 No. 16-CV-2212, 2022 WL 4132441 (N.D. Ill. Sept. 12, 2022).........................................11, 12

*Snyders Heart Valve LLC v. St. Jude Med.*,
 No. CV 18-2030 (JRT/DTS), 2020 WL 1445835 (D. Minn. Mar. 25, 2020)...........................7

*SynQor, Inc. v. Artesyn Tech., Inc.*,
No. 07-497, 2011 WL 3625036 (E.D. Tex. Aug. 17, 2011) .......................................39

*TQ Delta, LLC v. 2Wire, Inc.*,
No. CV 13-1835-RGA, 2021 WL 3202077 (D. Del. July 28, 2021) .........................37

*TQ Delta, LLC v. ADTRAN, Inc.*,
No. CV 14-954-RGA, 2019 WL 4346530 (D. Del. Sept. 12, 2019)...........................37

*Trustees of Columbia Univ. in the City of New York v. Symantec Corp.*,
390 F. Supp. 3d 665 (E.D. Va. 2019) ......................................................................13

*Trustid, Inc. v. Next Caller Inc.*,
No. 18-172 (MN), 2021 WL 3015280 (D. Del. July 6, 2021) ..................................11

*United States v. Am. Express Co.*,
No. 10-CV-4496 (NGG) (RER), 2014 U.S. Dist. LEXIS 87360 (E.D.N.Y. Jun. 24, 2014) ......15

*United States v. Baskes*,
649 F.2d 471 (7th Cir. 1980) ...................................................................................15

*United States v. Gomez*,
725 F.3d 1121 (9th Cir. 2013) .................................................................................15

*United States v. Mejia*,
545 F.3d 179 (2nd Cir. 2008) ..................................................................................21

*ViaTech Techs., Inc. v. Microsoft Corp.*,
No. CV 17-570-RGA, 2021 WL 663057 (D. Del. Feb. 19, 2021)...........................38

*Wasica Fin. Gmbh v. Schrader Int'l, Inc.*,
432 F. Supp. 3d 448 (D. Del. 2020) ......................................................................7, 9

*Wi-LAN Inc. v. LG Elecs., Inc.*,
421 F. Supp. 3d 911 (S.D. Cal. 2019) .................................................................11, 12

*Woods v. DeAngelo Marine Exhaust, Inc.*,
692 F.3d 1272 (Fed. Cir. 2012) ..............................................................................36

*Zeiss A.G. v. Nikon Corp.*,
No. 2:17-CV-07083-RGK-MRW, 2018 WL 5078256 (C.D. Cal. Oct. 4, 2018)......................24

**STATUTES**

35 U.S.C. § 315(e)(2).................................................................................................5

**RULES**

Fed. R. Civ. P. 15(c)(1)(B.........................................................................................27

Fed. R. Civ. P. 26(e)(1).................................................................36

Fed. R. Civ. P. 37(c)(1).................................................................26

Fed. R. Evid. 702.........................................................................21

Fed. R. Evid. 703.................................................................15, 19, 40

# I.    SUMMARY OF THE ARGUMENTS

IPA moves the Court for an order precluding Microsoft and its expert from relying on printed publications for its validity defenses. Microsoft filed eight IPRs against the Asserted Patents and the PTAB issued final written decisions, irrefutably triggering the estoppel provisions of 35 U.S.C. §315(e)(2) and preventing Microsoft from relying on patents and printed publications that could have been raised— and in some cases were raised—during the multiple IPRs. Yet despite clear statutory mandates excluding reliance on printed publications, Microsoft and its expert continue to improperly rely on printed publications to advance invalidity theories in this case. Having failed to play by the rules, Microsoft must be affirmatively estopped by this Court from taking a second bite from the proverbial apple. Applying IPR estoppel to the subject references will also significantly narrow the issues for trial.

IPA also seeks to exclude certain opinions of Microsoft's validity expert, Dr. Sycara. Specifically, the dubious opinions involve (1) the alleged public availability of third-party printed publications, (2) Microsoft's theory that certain source code was used at a demonstration, and (3) alleged failure to name an inventor. Dr. Sycara does not possess the personal, technical, or specialized knowledge required by Fed. R. Evid. 703 to opine on these issues and is simply acting as a mouthpiece for Microsoft's litigation narrative.

Next, IPA seeks a ruling that it is not precluded from seeking pre-suit damages for failure to mark under 35 U.S.C. § 287(a). IPA asked Microsoft during discovery to identify any products it contends should have been marked. However, Microsoft defaulted on its burden of production and failed to identify such products, as required by Federal Circuit precedent. In the alternative, IPA asks the Court to confirm that its Second Amended Complaint relates back to the filing date of the original complaint. Resolving these issues will solidify the relevant damages period and streamline the presentation of issues at trial.

IPA also requests the Court strike opinions from Microsoft's damages expert, Dr. Becker, regarding a reasonable royalty in this action. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

Finally, IPA asks that the Court strike opinions from Microsoft's experts related to alleged non-infringing alternatives as Microsoft declined to answer interrogatories or produce witnesses on this topic during fact discovery. This failure warrants exclusion of subsequent opinions relying on non-infringing alternatives under Fed. R. Civ. P. 37(c).

## II.    NATURE AND STAGE OF THE PROCEEDING

IPA filed suit against Microsoft on January 1, 2018 and filed its second amended complaint, adding U.S. Patent Nos. 6,251,115 and 7,069,560 ("Asserted Patents"), on March 20, 2018. (D.I. 16.) Following the PTAB's institution of multiple IPRs filed by Microsoft, the case was stayed in January 2020. (D.I. 77.) The stay lifted in October 2022 and discovery proceeded in accordance with a scheduling order. (D.I. 89, D.I. 98.) Fact discovery closed on August 4, 2023 and expert discovery closed on November 17, 2023. Trial is set for May 6, 2024. (D.I. 98 and 225.)

## III.   IPR ESTOPPEL PRECLUDES MICROSOFT AND ITS EXPERT FROM RELYING ON PRINTED PUBLICATIONS TO ADVANCE INVALIDITY THEORIES

### A.    Background

#### 1.    IPA's prior requests to strike

IPA previously requested to strike portions of Microsoft's invalidity contentions as impermissibly relying on patents and printed publications in violation of the IPR estoppel provisions of 35 U.S.C. § 315(e)(2). (D.I. 117.) The Court denied the request, without prejudice,

as premature. At the time, Magistrate Judge Fallon stated, "Plaintiff may renew its motion after case narrowing has occurred with a request for an extension of page limitations, if necessary." (Oral Order dated Feb. 8, 2023.) After Microsoft narrowed its election of prior art (D.I. 147), IPA renewed its request. (D.I. 175) The Court again denied the motion as premature, with Magistrate Judge Fallon stating "the issue raised in the joint motion for a teleconference is not a discovery dispute and instead seeks partially dispositive relief precluding Defendant's reliance on certain prior art." (D.I. 177.) In accordance with the Court's prior orders, and now that the case has reached the dispositive motion stage, IPA again requests that this Court affirmatively estop Microsoft from relying on printed publications to advance its invalidity theories, as statutorily required under 35 U.S.C. § 315(e)(2).

### 2. District court litigation and IPRs

In 2019, the PTAB instituted eight IPR petitions filed by Microsoft (IPR2019-00810, -00811, -00812, -00813, -00814, -00835, -00836, and -00837), collectively challenging all 144 issued claims of the '115 and '560 Patents. (Exs. A-H.)

In December 2019, Microsoft joined Google's motion to stay these and other related district court proceedings pending the IPRs because "a stay of litigation until completion of the IPR proceedings will simplify, if not wholly eliminate, issues for trial and promote judicial economy." (D.I. 75.) Google (joined by Microsoft) argued that a stay should be granted because "estoppel stands to narrow invalidity defenses in the litigation." *See IPA v. Google*, No. 18-cv-00318-RGA-SRF, D.I. 74 (Dec. 18, 2019). The Court granted the motion.

Between October 15 and November 22, 2020, the PTAB issued Final Written Decisions ("FWDs") in all eight instituted IPRs filed by Microsoft. After an appeal to the Federal Circuit, twenty-eight of the challenged claims asserted against Microsoft survived. (Exs. I-L.) The stay was lifted on this case in October 2022, and a new scheduling order was entered. (D.I. 89, 98.)

3

On May 1, 2023, IPA reduced its asserted claims. (D.I. 144.) On May 15, 2023, Microsoft served its Identification of Base Prior Art References (Ex. M) and updated its disclosure of prior art references on June 6 (Ex. N). Through Microsoft's identification of prior art references, it became clear that Microsoft intended to impermissibly rely on patents and printed publications that could have been raised—and in some cases were raised—during the IPRs. This prompted IPA's renewed motion to strike mentioned above.

On September 8, 2023, Microsoft's validity expert, Dr. Sycara, submitted her opening report, which focused on two "systems"—(1) the "CNET OAA System" and (2) the "Warren Implementation of the RETSINA System"—and a printed publication entitled "Building Distributed Software Systems with the Open Agent Architecture" ("Martin Paper"). (Ex. O, ¶¶77; *see also* D.I. 216.) The alleged CNET OAA System is an amalgamation of "demonstration, source code, documents, and publications," including:

(1) the "CNET Demonstration Video,"

(2) "Statement on SRI's Plans for distributing the Open Agent Architecture,"

(3) "OAA Distribution and Documentation,"

(4) "OAA-USERS mailing list,"

(5) "agentlib.c," and

(6) "OAA Tutorial."

Dr. Sycara claims all these documents were publicly available on various websites prior to the critical date of the Asserted Patents. (Ex. O, ¶ 80.) Likewise, the so-called Warren Implementation of the RETSINA System comprises "RETSINA source code" and eight publications co-authored by Dr. Sycara:

(1) "Coordination of Multiple Intelligent Software Agents" ("Sycara"),

(2) "Distributed Intelligent Agents" ("Sycara 2"),

(3) "Intelligent Adaptive Information Agents" ("Decker 2"),

(4) "Middle-Agents for the Internet" ("Decker 3"),

(5) "Designing a Multi-Agent Portfolio Management System" ("Decker 4"),

(6) "Matchmaking and Brokering" ("Decker 5"),

(7) "Unified Information and Control Flow in Hierarchical Task Networks" ("Williamson"), and

(8) "Executing Decision-theoretic Plans in Multi-agent Environments" ("Williamson 2"). (Ex. O, ¶ 91.)

Based on the composition of these alleged systems, Microsoft is advancing multiple pieces of alleged prior art and printed publications as the foundation of its invalidity theories—all of which were available to Microsoft prior to filing the IPRs and therefore could have been raised (and in some cases were raised) in the PTAB proceedings challenging the very same patents and the very same claims.

## B.    IPR Estoppel Is Applied Broadly

When the PTAB issues a Final Written Decision ("FWD"), estoppel attaches and precludes the petitioner (here, Microsoft) from raising any invalidity grounds in district court litigation that could have been raised during the IPRs. *See* 35 U.S.C. § 315(e)(2). The Federal Circuit has affirmed the broad scope of IPR estoppel: "[t]o give effect to the language 'reasonably could have raised,'" as used in § 315(e)(2), "estoppel applies not just to claims and grounds asserted in the petition and instituted for consideration by the Board, but to all grounds not stated in the petition but which reasonably could have been asserted against the claims included in the petition.'" *Click-to-Call Techs. LP v. Ingenio, Inc.*, 45 F.4th 1363, 1370 (Fed. Cir. 2022) (quoting *Cal. Inst. of Tech. v. Broadcom Ltd.*, 25 F.4th 976, 991 (Fed. Cir. 2022)).

Courts in this District likewise recognize that broadly applying IPR estoppel conserves

judicial resources and prevents a defendant from gaining a tactical advantage by reaping the benefits of an IPR (which operates under a lower burden of proof) without any meaningful litigation tradeoff. *See Parallel Networks Licensing, LLC v. Int'l Bus. Machines Corp.*, No. CV 13-2072 (KAJ), 2017 WL 1045912, at *11-12 (D. Del. Feb. 22, 2017) *aff'd*, 721 Fed. Appx. 994 (Fed. Cir. 2018) ("[a]llowing IBM to raise arguments here that it elected not to raise during the IPR would give it a second bite at the apple and allow it to reap the benefits of the IPR without the downside of meaningful estoppel."); *Novartis Pharms. Corp. v. Par Pharm. Inc.*, No. CV 14-1289-RGA, 2019 WL 9343055, at *2 (D. Del. Apr. 11, 2019) ("One of the policy objectives behind the introduction of IPR proceedings was an intention to conserve judicial resources…Allowing an IPR petitioner to have two bites at the apple by holding back certain obviousness combinations runs counter to both the clear language and purpose behind § 315.").

Recently, Chief Judge Saylor of the District of Massachusetts authored a highly instructive opinion based on facts virtually identical to those at issue here. *See Singular Computing LLC v. Google LLC*, No. CV 19-12551-FDS, 2023 WL 2839282 (D. Mass. Apr. 6, 2023). In *Singular*, Google initiated IPR proceedings against three patents that Singular had asserted in district court litigation. Ultimately, FWDs issued with certain claims surviving the IPRs, which Singular continued to assert before the trial court. *Id*. Singular also moved for summary judgment, arguing Google was estopped from raising certain defenses under 35 U.S.C. § 315(e)(2). *Id*. Three categories of prior art patents and printed publications were at issue: (1) those that Google actually raised in the IPR proceeding; (2) those that Google did not raise in its IPRs, but was aware of at the time of that proceeding; and (3) those concerning system prior art. *Id*. at *6.

At the outset, Judge Saylor said, "Congress included an estoppel provision in the AIA to avoid duplicative and abusive validity challenges before the PTAB and the district courts." *Id*. at

*3. Upon analyzing the statutory text, the court concluded that "ground" in §315(e)(2) refers "to any anticipation or obviousness claim based on prior art in the form of a patent or printed publication" because that "reading is more faithful to the statutory text, which uses the term 'ground' in § 311(b) to refer to an anticipation or obviousness claim, not a particular piece of evidence." *Singular,* 2023 WL 2839282, at *5. Further, the court observed its reading to be

> more faithful to the purpose of the estoppel bar, which is to avoid duplicative litigation. It follows that a party is estopped from raising any invalidity theory under § 102 or § 103 based on "patents and publications" that were actually submitted in the IPR proceeding, or that reasonably could have been submitted. That is true whether the patent or publication at issue describes, explains, or refers to a system or device, and whether the patent or publication is relied on in the subsequent litigation in whole or only in part. And that is true even if the defendant could not have presented evidence of the actual system or device in the IPR proceeding.

*Id.* at *5; *see also id.* (citing and relying on *Wasica Fin. Gmbh v. Schrader Int'l, Inc.*, 432 F. Supp. 3d 448, 454 (D. Del. 2020) (Stark, J.)).

Judge Saylor then turned to the three specific categories of art at issue. *First*, the court held "[r]eferences that Google *explicitly cited to in the IPR proceedings clearly fall within the estoppel bar* of § 315(e)(2)…[a]ccordingly, Google will be estopped from alleging invalidity based on any of the patent or printed publication references included within its IPR petitions." *Singular,* 2023 WL 2839282, at *6 (emphasis added).

*Second*, where Google knew about art when it filed its IPRs, the court held that "Google will be estopped from asserting invalidity based on the printed publication and patent references identified in its invalidity contentions and claim charts." *Id; see also IOENGINE, LLC v. PayPal Holdings, Inc.*, 607 F. Supp. 3d 464, 510-11 (D. Del. 2022) (applying IPR estoppel to prior art disclosed in invalidity contentions); *Snyders Heart Valve LLC v. St. Jude Med.*, No. CV 18-2030 (JRT/DTS), 2020 WL 1445835, at *8 (D. Minn. Mar. 25, 2020) (same).

*Third*, although Google asserted that "it intends to rely on a variety of evidence of prior-

art systems (alone and in combination with printed publications) in support of its invalidity arguments," including evidence that it could not submit to the PTAB, such as source code and oral presentations, the *Singular* court also found that estoppel applied to this additional evidence as well—whether it was asserted alone or in combination. *Singular,* 2023 WL 2839282, at \*6. Indeed, although Google stated that it sought "to use some of that evidence **in combination with printed publications**, and states that the expert testimony may rely in part upon those publications," the *Singular* court squarely rejected that position because "[t]o allow a party to present the same evidence styled as a different 'theory' of invalidity would permit a party challenging a patent to make a complete end-run around the estoppel bar."[1] *Singular,* 2023 WL 2839282, at \*5. The court precluded the use of patents and printed publications in combination with system art:

> Google is estopped from using patents and printed publications of which it was aware, or reasonably should have been aware, at the time of the IPR proceeding. **That bar applies whether the patents and printed publications are offered as stand-alone evidence, or in combination with other evidence that could not have been presented at the IPR proceeding**.

*Id*. at \*7 (emphasis added).

*Singular's* analysis and reasoning align with recent developments and the trajectory of Federal Circuit IPR estoppel jurisprudence, giving full effect to the statutory text and the congressional intent of estoppel to prevent IPR abuse and gamesmanship, promote litigation efficiency, and comport with opinions from other district courts that have reached similar conclusions. *See Biscotti Inc. v. Microsoft Corp.,* No. 2:13-CV-01015-JRG-RSP, 2017 WL 2526231, at \*8 (E.D. Tex. May 11, 2017) ("[i]f [ ] Microsoft's purported system prior art relies on or is based on patents or printed publications that Microsoft would otherwise be estopped

---

[1] Unless otherwise noted, all emphasis added by IPA.

from pursuing at trial, e.g., patents or printed publications that a 'skilled searcher conducting a diligent search reasonably could have been expected to discover,' then Microsoft should be estopped from presenting those patents and printed publications at trial."); *Wasica*, 432 F. Supp. 3d at 454 (broadly applying IPR estoppel because a "petitioner is estopped from proceeding in litigation on [] [IPR] **grounds**, even if the **evidence** used to support those grounds was not available to be used in the IPR."); *Cobalt Boats, LLC v. Sea Ray Boats, Inc.*, No. 2:15-cv-21, 2017 WL 2605977, at *4 (E.D. Va. June 5, 2017) (estopping former petitioner from relying on product manuals that reasonably could have been raised in IPR).

## C.  Microsoft Should Be Precluded From Relying on Publications at Trial, Including Those That Comprise the Alleged CNET OAA and RETSINA Systems

Microsoft knew when its IPRs were instituted that estoppel would attach when the FWDs issued. IPA respectfully requests that this Court apply the full force and breadth of § 315(e)(2) estoppel and preclude Microsoft from relying on the following printed publications to support its invalidity defenses against the '115 and '560 Patents.

### 1.  Microsoft could have relied on the Martin Paper in its IPRs

Dr. Sycara purports to combine both the CNET OAA and RETSINA Systems with the Martin Paper, which is indisputably a printed publication. (Ex. O, *passim*.)[2] The Martin Paper is identified on the cover of the '115 and '560 Patents under "Other Publications" (D.I. 16-5 and 16-6) and was the subject of a rejection during prosecution that the applicants overcame. (Ex. P.) The Martin Paper was also identified in Defendants' Initial Invalidity Contentions. (Ex. Q, pp.

---

[2] Specific examples are found at ¶¶106, 132, 148-150, 168-171, 191, 201-203, 217-223, 235-238, 246-248, 258-260, 267-268, 277-280, 293-296, 300-301, 309-310, 317, 336, 347, 352, 359, 364, 369, 374, 379, 384, 389, 394, 399, 406, 418, 430, 451, 460, 471, 479, 493, 502, 505, 508, 516, 522, 525, 532, 535, 540, 545, 550, 556, 564, 567, 571, 575, 578, 581, 584, 587, 590, 593, 596, and 601.

11, 30, 103, 120.) Moreover, Microsoft's co-defendant, Google, filed IPRs based on Martin Paper three weeks *before* Microsoft filed its IPRs, establishing that Microsoft could have used the Martin Paper in its IPRs. (Ex. R, pp. 1, 7-16, 66; Ex. S, pp. 1, 9-16, 73; Ex. T, pp. 1, 9-16, 69.)

Because Microsoft was aware of the Martin Paper and could have relied on it in its IPRs, this reference should be stricken, and Dr. Sycara and Microsoft should be precluded from relying on it to argue invalidity. *See Singular*, 2023 WL 2839282, at *6 (estopping defendant from relying on art cited in invalidity contentions).

### 2. Printed publications that Microsoft seeks to combine as alleged "System Art" to evade IPR estoppel should be excluded

#### a. CNET OAA Publications

For the CNET OAA (Open Agent Architecture) publications (identified above), several OAA-related papers and publications are identified on the covers of the '115 and '560 Patents in addition to identifying SRI, the company responsible for developing OAA. (D.I. 16-5 and 16-6.) Given that the '115 and '560 patents are based on version 2.0 of OAA (D.I. 16-5, 23:4-23, 4:44-55; D.I. 16-6, 23:34-56, 4:40-51), a reasonable researcher would have thought to look further into SRI and its website to see what other OAA-related information was available. Indeed, this appears to be precisely what Microsoft did because its invalidity charts identify Internet Archive (aka WayBackMachine) URL addresses corresponding to snapshots of the SRI website. (Ex. U, p. 1; Ex. V, p. 1.) Indeed, the following "publications" that Dr. Sycara jumbles together to form the so-called CNET OAA System are identified in Microsoft's invalidity contentions: (1) "Statement on SRI's Plans for distributing the Open Agent Architecture," (2) "OAA Distribution and Documentation," (3) "OAA-USERS mailing list," (4) "agentlib.c," and (5) "OAA Tutorial." Dr. Sycara and Microsoft admit these references were publicly available on SRI websites. (Ex. U, p. 1; Ex. V, p. 1; Ex. O, ¶ 80.) The snapshots are from the late 1990s, well before Microsoft's IPR

filing deadline, and incorporated into the original invalidity contentions.[3]

Numerous courts have concluded that the presence of certain prior art in a defendant's invalidity contentions is compelling evidence that a reasonable researcher could locate such references. *See Trustid, Inc. v. Next Caller Inc.*, No. 18-172 (MN), 2021 WL 3015280, at *1 (D. Del. July 6, 2021) ("[T]he fact that Defendant included [the disputed reference] in its invalidity contentions filed just several months after the IPR petition confirms that a skilled searcher likely would have been able to find the reference."); *Sioux Steel Co. v. Prairie Land Mill Wright Servs.*, No. 16-CV-2212, 2022 WL 4132441, at *11 (N.D. Ill. Sept. 12, 2022) ("Because these references were 'found in a later prior art search, there is a reasonable inference that [they] could have been found earlier by a skilled searcher.'" (quoting *GREE, Inc. v. Supercell Oy*, No. 2:19-CV-00071-JRG-RSP, 2020 WL 4999689, at *5 (E.D. Tex. July 9, 2020)); *Wi-LAN Inc. v. LG Elecs., Inc.*, 421 F. Supp. 3d 911, 925 (S.D. Cal. 2019) ("Several district courts have held that the identification of prior art in invalidity contentions generated prior to the filing of the IPR petition is sufficient to establish as matter of law that the accused infringer knew of those prior art references, and, thus, that the references 'reasonably could have [been] raised' in the IPR."). As such, Microsoft could have located and relied on these five references in its IPRs.

Microsoft and Dr. Sycara also rely on a "CNET Demonstration Video" bearing Bates number DEFS_IPA_PPA00040913. (Ex. O, ¶ 80.) Microsoft produced this video with its initial invalidity contentions on November 18, 2019. (Ex. Y.) The fact that Microsoft produced the video with its original invalidity contentions served four years ago is strong evidence a reasonable researcher could—and indeed did—locate it. *Trustid*, 2021 WL 3015280, at *1; *Sioux*

---

[3] Exs. U and V are revised versions of the original invalidity charts served on August 23, 2019, which identified the same OAA publications. (*See* Ex. W, pp. 1-2; Ex. X, pp. 1-2.)

*Steel Co.*, 2022 WL 4132441, at *11; *Wi-LAN*, 421 F. Supp. 3d at 925.

To the extent Microsoft attempts to argue that a video does not constitute a printed publication, the case law holds otherwise. In *Medtronic Inc. v. Barry*, IPR2015-00780, Paper 51, at 8-9 (PTAB Sept. 7, 2016), the PTAB held that a video qualifies as a "printed publication" under the precedent outlined in *In re Wyer*, 655 F.2d 221, 227 (C.C.P.A. 1981):

> A narrated demonstration recorded on CD, as in the Video, satisfies the "printed" requirement of the statute because the CD includes indicia stored on it that defines the content to be displayed, i.e., the "printed component" urged by Patent Owner is found in the indicia stored on the CD or other electronic medium. Thus, the Video is not excluded from the scope of 35 U.S.C. § 311(b) on the sole basis that the Video is not "printed."

*See id.*; *see also In re Wyer*, 655 F.2d at 227 ("whether information is printed, handwritten, or on microfilm or a **magnetic disc** or **tape**, etc., the one who wishes to characterize the information, in whatever form it may be, as a 'printed publication'….").

The Board ultimately excluded the video, a narrated surgical procedure, as not publicly disseminated. On appeal, the Federal Circuit did not disturb the Board's determination that a video can constitute a "printed publication," but remanded to consider whether the video was publicly accessible for prior art purposes. *Medtronic, Inc. v. Barry*, 891 F.3d 1368, 1383 (Fed. Cir. 2018). Since videos qualify as "printed publications," Microsoft should also be estopped from relying on the CNET Demonstration Video since it was produced with Microsoft's original prior art references and could have been located in time to use in its IPRs. *See Trustid*, 2021 WL 3015280, at *1; *Medtonic*, IPR2015-00780, Paper 51 at 8-9.

In sum, Microsoft and Dr. Sycara should be estopped and precluded from relying on the above-referenced OAA-related publications, including the CNET Demonstration Video, to prove invalidity at trial. *See Singular*, 2023 WL 2839282, at *6-7 (estopping defendant from relying on patents or printed publications in combination with system art).

### b.  RETSINA Publications

According to Dr. Sycara, the so-called Warren Implementation of the RETSINA System comprises at least eight publications co-authored by Dr. Sycara, along with certain source code. (Ex. O, ¶ 91.) At the outset, the publication "Sycara 2" (*i.e.*, "Distributed Intelligence Agents") is cited on the cover of the '115 Patent and identifies "Sycara, Katia" as the lead author. (D.I. 16-5; Ex. Z, p. 1; Ex. AA, p. 1.) Any researcher looking for prior art would review the art cited during prosecution and would have found "Sycara 2." Then, a researcher reviewing "Sycara 2" who found it of interest (as Microsoft and its expert did) would be motivated to search for additional papers by Dr. Sycara.

A simple Google search for "Katia Sycara" reveals she is a Carnegie Mellon University (CMU) professor. As it still does today, Dr. Sycara's CMU website in September 2017 (before Microsoft filed its IPRs) lists all her publications, including the papers identified as "Sycara," "Sycara 2," "Decker 2," "Decker 3," "Decker 4," "Decker 5," "Williamson," and "Williamson 2." (Ex. BB.) Indeed, the covers of Microsoft's invalidity charts admit as much. (Ex. Z, pp. 1-2; Ex. AA, pp. 1-2) (referring to links found on Dr. Sycara's CMU webpage).) Thus, any reasonable researcher would have found the eight publications relied on by Dr. Sycara with minimal effort. (Ex. EE, 144:11-145:9 (admitting that the publications in question were published, available, and could be located by a POSITA). *See also Ironburg Inventions Ltd. v. Valve Corp.*, 64 F.4th 1274, 1299 (Fed. Cir. 2023) (applying the skilled researcher standard.) Moreover, Microsoft has not argued, and cannot plausibly argue, that it would be unable to locate the papers of its own expert.

Dr. Sycara also relies on RETSINA source code, which courts have indicated constitutes a "printed publication." *See Trustees of Columbia Univ. in the City of New York v. Symantec Corp.*, 390 F. Supp. 3d 665, 674 (E.D. Va. 2019) ("[this court] would likely find that source code could constitute[s] a printed publication" because "[a] 'printed publication' may include information

that 'is printed, handwritten, or on microfilm or a magnetic disc or tape, etc.'" (quoting *In re Wyer*, 655 F.2d at 227). Once again, before the IPR filing deadline, Dr. Sycara's CMU webpage (http://www.cs.cmu.edu/~softagents/) contained links to RETSINA code, which a skilled researcher (or anyone using Google) would have found.. (Ex. CC; *see also* Ex. DD (containing a link for download instructions for RETSINA toolkit software).) Indeed, Microsoft specifically cites that webpage link in its invalidity charts, further evidencing that a researcher would have found RETSINA code. (Ex. Z, p. 1; Ex. AA, p. 1.) Moreover, Microsoft cannot credibly argue that it would have been unable to locate the source code developed by its own expert.

The entire "Warren Implementation of the RETSINA System" is comprised of printed publications. Microsoft is statutorily estopped from using these publications to prove invalidity. *See Singular*, 2023 WL 2839282, at *6-7 (estopping defendant from relying on patents or printed publications in combination with system art). As such, this Court should preclude Microsoft and Dr. Sycara from raising the Warren Implementation of the RETSINA System at trial. Specifically, the Court should preclude Microsoft and Dr. Sycara from relying on "Sycara," "Sycara 2," "Decker 2," "Decker 3," "Decker 4," "Decker 5," "Williamson," "Williamson 2," and the RETSINA source code (*see* Ex. O, ¶ 91) in attempting to prove invalidity of the Asserted Patents.

## IV.     THE COURT SHOULD EXCLUDE CERTAIN OPINIONS OF DR. SYCARA

Microsoft's validity expert, Dr. Sycara, is not an attorney, has no specialized legal training in patent law, and is not an expert in IPR proceedings. (Ex. EE, 11:22-12:1, 24:16-18, 26:15-18, 159:17-160:8.) Despite this, she opines on ultimate legal issues and advocates the application of law to certain evidence, specifically: (1) the alleged failure to name Dr. Moran as an inventor on the Asserted Patents and (2) the alleged public availability of certain references. She also opines that certain third-party source code produced by SRI corresponds to the source code used for a specific demonstration (the "CNET Demonstration Video" discussed above) despite having no

personal knowledge of such facts and never having worked for SRI. That is not the role of an expert witness. *See, e.g., United States v. Baskes*, 649 F.2d 471, 479 (7th Cir. 1980) (Rule 704 permits opinions on ultimate issues but has limits: it "does not provide that witnesses' opinions as to the legal implications of conduct are admissible."); *see also Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004) ("[A]n expert witness cannot give an opinion as to her legal conclusion, i.e., an opinion on an ultimate issue of law.").

It is also inappropriate for experts to act as mere conduits for others' hearsay or as vehicles for factual narrative. *See Williams v. Illinois*, 567 U.S. 50, 80 (2012) ("[T]rial courts can screen out experts who would act as mere conduits for hearsay by strictly enforcing the requirement that experts display some genuine 'scientific, technical, or other specialized knowledge [that] will help the trier of fact to understand the evidence or to determine a fact in issue.'"); *Presley v. Com. Moving & Rigging, Inc.*, 25 A.3d 873, 893 (D.C. 2011) (similar). While experts may present a summary of record evidence to provide background information, it is improper for a party to use the expert to construct a factual narrative for the case. *See, e.g., United States v. Am. Express Co.*, No. 10-CV-4496 (NGG) (RER), 2014 U.S. Dist. LEXIS 87360, at *67-68 (E.D.N.Y. Jun. 24, 2014). An expert witness may not be allowed to "simply repeat[] hearsay evidence without applying any expertise whatsoever[.]" *United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008) (quotation omitted). Rather, experts may offer opinions based on otherwise inadmissible testimonial hearsay only if "experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject," as permitted by Fed. R. Evid. 703, and if they are "applying [their] training and experience to the sources before [them] and reaching an independent judgment," as opposed to "merely acting as a transmitter for testimonial hearsay." *United States v. Gomez*, 725 F.3d 1121, 1129 (9th Cir. 2013) (quotation omitted). Here, Dr. Sycara's report and opinions violate these established tenets.

## A. Dr. Sycara Cannot Opine on the Public Availability of SRI Code or Functionality Allegedly Shown at any SRI Demonstration[4]

One of the alleged "systems" in Dr. Sycara's Opening Report relates to the Open Agent Architecture ("OAA") project, and more particularly the conglomeration of references Dr. Sycara refers to as the "CNET OAA System." (Ex. O, ¶¶78-80.) As background, the OAA project was an ever-evolving software architecture developed in the mid to late 1990s by Adam Cheyer and David Martin, the named inventors of the Asserted Patents, while employed at SRI. During discovery and in response to a subpoena, SRI produced native source code files purportedly related to OAA.

Whether Microsoft can rely on the CNET OAA System as prior art depends on a showing, by clear and convincing evidence, that the CNET OAA System was publicly demonstrated and available before the critical date. IPA does not dispute that there is general testimony in the record concerning demonstrations of SRI projects that utilized certain aspects of the OAA framework. As the foundation of her so-called CNET OAA System, however, Dr. Sycara relies on the CNET OAA Video Demonstration (along with unspecified OAA source code and other references). Yet Dr. Sycara has made no showing, nor can she, that the CNET OAA Video Demonstration is prior art to the Asserted Patents.

The key questions are: (1) what functionality was allegedly demonstrated and (2) how that specific functionality was implemented in the alleged CNET OAA Video Demonstration. Because of the nature of the claim limitations, the only way to answer these questions is to examine the specific source code used for the CNET OAA Video Demonstration, especially since OAA was ever-evolving and changing. (Ex. FF, 49:8-21.) However, SRI did not produce code

---

[4] If the Court grants IPA's motion regarding IPR estoppel, the request to exclude Dr. Sycara's opinions on public availability may be rendered moot.

identified as being used in the CNET OAA Video Demonstration. Undeterred by this glaring problem, Dr. Sycara simply assumes that certain produced SRI code must be the code that corresponds to the CNET OAA Video Demonstration, using such terms as "CNET OAA source code" throughout her report. She specifically states, without support, that "[t]he 1994/1995 OAA Automated Office source code corresponds to the functionality in the Automated Office CNET demonstration…"). (Ex. O, ¶ 83.)

Microsoft seeks to circumvent its burden of proving public availability by having Dr. Sycara opine (assume) that the SRI OAA code corresponds to the CNET OAA Video Demonstration so Microsoft can argue that the code was publicly demonstrated and available and, therefore, prior art. Using those unfounded assumptions as the basis for her opinion, Dr. Sycara then opines that the SRI source code allegedly invalidates various claim elements. (Ex. O, pp. 124-240, including, but not limited to, ¶¶ 126-29, 139-45, 158, 160-65, 179-88, 197-98, 212-14, 273, 291, 306, 321, 332-33, 340, 356.) Microsoft's entire invalidity theory based on the CNET OAA System rests on this shaky ground.

In a similar vein, Dr. Sycara also relies heavily on a file called compound.pl that she found in the general SRI code production. (Ex. O, ¶¶ 87, 142, 145, 164.) Dr. Sycara claims that the compound.pl file was publicly available, but she has no personal basis for making that assertion other than it fits Microsoft's litigation narrative (*see infra*.) Moreover, inventor Martin, the author of the file in question, unambiguously stated that the version of compound.pl in the SRI production relied on by Dr. Sycara "was not the complete version of this file," that file was not completed until much later, and it was kept confidential until after the filing of the patent application. (Ex. GG, ¶¶ 20-27.) But Dr. Sycara does not substantively address this contrary

evidence.[5]

Dr. Sycara is not qualified to render opinions on public availability. (Ex. EE, 180:1-10.) Dr. Sycara is not a lawyer, does not have specialized training in patent law, and does not even articulate the relevant legal standards for public availability in her report. (Ex. EE, 11:22-12:1, 24:16-18, 159:17-160:8; Ex. O, Section V.) As such, the Court should exclude her opinions on public availability.

As it pertains to her testimony linking SRI source code to the CNET OAA Video Demonstration, Dr. Sycara has previously admitted she was never an SRI employee and, therefore, lacks personal or specialized knowledge for her opinions. (Ex. HH, , 103:13-15, 126:1-128:2.) Further, when asked whether she knew about any of SRI's internal policies or procedures governing demonstrations, she replied, "I don't have any knowledge of their procedures, if there are any[,]" and that she was relying on her "impressions." (Ex. HH, 126:1-128:2.) Nowhere in her report does Dr. Sycara claim she was personally involved in the CNET OAA Video Demonstration in which the SRI code was allegedly publicly demonstrated. In addition, Dr. Sycara did not speak to anyone at SRI regarding the code they produced, and Microsoft did not depose SRI on this topic during discovery. The lack of foundation for Dr. Sycara's opinion is particularly relevant because IPA submitted declarations from inventor Martin and an SRI representative (originally produced in the Amazon Matter) that establish that SRI did not track what code was used with a given presentation, did not have established naming conventions, and that code was not publicly available. (Ex. GG, ¶¶12-19; Ex. II, ¶¶21-31.)[6] Further, Dr. Sycara has

_____

[5] Dr. Sycara acknowledged that individuals who code files are the best sources of information, which in the case of the compond.pl file is inventor Martin. (Ex. EE, 117:24-122:23.)

[6] Messrs. Martin and Perrault are identified on IPA's initial disclosures, but Microsoft elected not to depose them in this matter. (Ex. JJ.) As she was also the expert in the Amazon Matter, Dr.

never claimed she was involved with the development of OAA at any time, let alone before the critical date. As a result, Dr. Sycara is not qualified to opine on the alleged public availability of the SRI code or to claim that any code produced by SRI is the actual code used in the CNET OAA Video Demonstration, as she has no personal, technical, or specialized knowledge. *See* Fed. R. Evid. 703.

To establish public availability of source code, there must be "sufficient proof of its dissemination or that it has otherwise been available and accessible to persons concerned with the art to which the document relates and thus most likely to avail themselves of its contents." *In re Wyer*, 655 F.2d at 227. Thus, a fundamental and critical question is, as it pertains to any SRI OAA source code or any alleged demonstration of any OAA-related implementations, what specific source code was used? What specific functionality was shown, and how was that functionality implemented? The only way to answer these questions is to definitively identify and examine the actual source code used for a particular demonstration.

There is no evidence in the record, however, tying any particular version of OAA code, including the code produced by SRI, to any specific demonstration, including the CNET OAA Video Demonstration. (Ex. II, ¶¶ 23-31 (attesting there is no way to tie SRI code to any demonstration); [Ex. GG, ¶¶ 15-18, 30-31. (same).) Dr. Sycara is not qualified to opine on the public availability of the source code produced by SRI, much less whether that specific code was utilized in any public demonstration before the critical date. As a result, Dr. Sycara cannot definitively tie any specific version of the OAA code produced by SRI to any specific demonstration, much less the CNET OAA Video Demonstration from February 1997.

---

Sycara knew of the existence of these declarations and presumably had them before her as she drafted her report in this case.

This Court has struck expert opinions concerning prior art status when the expert was not qualified to opine on public availability. In *ART+COM Innovationpool GmbH v. Google Inc.*, 155 F. Supp. 3d 489, 509 (D. Del. 2016), the plaintiff moved to exclude defendants' expert "from opining on whether prior art references were published or in public use." The Court agreed that the expert "is neither a librarian, nor an archivist, and possesses no specialized knowledge on publication" and precluded such testimony at trial. *Id.*; *see also e.g., LG Elecs., Inc. v. Asko Appliances, Inc.*, No. 08-828-RGA, slip op. at 1-2 (D. Del. June 22, 2012) (technical expert was not qualified to testify as to what comprises "prior art" under 35 U.S.C. § 102(b)). The same result is warranted here. Since an expert's testimony is automatically imbued with an indicium of authority, this Court should preclude Dr. Sycara from opining that any specific version of SRI or OAA code was publicly available or used in any particular alleged public demonstration, including the CNET OAA Video Demonstration, because her opinions are not based on anything in her training, background, expertise, or specialized knowledge.

## B. Dr. Sycara's Inventorship Opinions Must be Excluded

In her Opening Report, Dr. Sycara catalogs selective evidence compiled by Microsoft and opines that Dr. Moran should have been named an inventor on the Asserted Patents. (Ex. O, ¶¶ 603-608; Ex. EE, 159:17-160:8 (admitting to "relying on the help of counsel" for the inventorship section of the report).) Furthermore, Dr. Sycara admitted that contrary evidence, specifically the PTAB depositions of inventors Cheyer and Martin, are not listed in the materials she considered, and she did not recall reviewing them (though Microsoft had access to these transcripts and could have provided them to Dr. Sycara). (Ex. EE, 160:9-161:15.) Nor did she consider the rebuttal evidence submitted by IPA's expert countering her opinions when submitting her reply report. (Ex. EE, 161:18-163:9.) In fact, she did not address the inventorship issue in her reply report at all. In other words, Microsoft is using Dr. Sycara as the mouthpiece to

sponsor its inventorship defense.

Some genuine "scientific, technical, or other specialized knowledge [that] will help the trier of fact to understand the evidence or to determine a fact in issue" is required for expert testimony to be admissible under Fed. R. Evid. 702. *Williams*, 567 U.S. at 80. Yet, throughout her opening report, Dr. Sycara purports to opine on the existence or non-existence of facts for which she has no personal knowledge and for which no technical expertise could possibly be relevant. *See United States v. Mejia*, 545 F.3d 179, 197 (2nd Cir. 2008) (holding experts are not allowed to "simply repeat[] hearsay evidence without applying any expertise whatsoever") (quotation omitted); *Securities and Exchange Commission v. Tourre*, 950 F. Supp. 2d 666, 675 (S.D.N.Y. 2013) ("Acting simply as a narrator of the facts does not convey opinions on an expert's knowledge and expertise; nor is such a narration traceable to a reliable methodology. Mere narration thus fails to fulfill Daubert's most basic requirements.").

Thus, Dr. Sycara does not have any "scientific, technical, or specialized knowledge" that would render her "opinion" useful to a jury. Further, to the extent compiling deposition testimony constitutes a "methodology," hers was fatally flawed for only considering favorable and not contrary evidence. As such, IPA respectfully requests that the inventorship opinions set forth in Dr. Sycara's Opening Report be struck and any corresponding testimony precluded. (Ex. O, ¶¶ 603-608.) *See also Knauf Insulation, LLC v. Johns Manville Corp.*, No. 115CV00111TWPMJD, 2023 WL 2769088, at *4-5 (S.D. Ind. Mar. 30, 2023) (excluding expert testimony directed to inventorship).

## V.  MICROSOFT DEFAULTED ON ITS *ARCTIC CAT* BURDEN OF PRODUCTION BY FAILING TO IDENTIFY SPECIFIC PRODUCTS IT CONTENDS ARE CAPABLE OF MARKING BUT WERE NOT MARKED

### A.  Factual Background

During discovery, IPA sought Microsoft's *Arctic Cat* contentions directed to any alleged

failure to mark that would bar past damages. (Ex. KK, No. 6.) On December 29, 2022, Microsoft responded:

> Microsoft is not presently aware of any products made or sold in the United States that embody the Asserted Patents or that have been marked with the numbers of the Asserted Patents. Accordingly, to the extent Plaintiff were to assert that any products made or sold in the United States embody the Asserted Patents, Microsoft contends that such products were not marked in the manner specified by § 287(a).

(*Id.*) Fact discovery closed on August 4, 2023. (D.I. 173.) On August 18, nine months ***after*** IPA initially served Interrogatory No. 6 and two weeks ***after*** the close of fact discovery, Microsoft served its first supplemental response stating:



## B. Microsoft Defaulted on its *Arctic Cat* Burden of Production

The Federal Circuit held in *Arctic Cat* that "an alleged infringer who challenges the patentee's compliance with § 287 bears an initial burden of production to articulate the products it believes are unmarked 'patented articles' subject to [§ 287(a)]." *Arctic Cat Inc. v. Bombardier Recreational Prod. Inc.*, 876 F.3d 1350, 1368 (Fed. Cir. 2017); *see also id.* (accused infringer must first identify "specific unmarked products which the alleged infringer believes practice the patent"); *id.* at 1369 (accused infringer has the "burden of production to identify unmarked products that it alleges should have been marked").

### 1. 

Microsoft defaulted on its *Arctic Cat* initial burden of production when it did not identify any specific product capable of being marked that Microsoft believes or alleges should have been

marked but was not. For several reasons, Microsoft's belated interrogatory response does not satisfy its initial burden of production because it failed to disclose any product or device **"it believes** are unmarked '**patented <u>articles</u>'** subject to [**the marking requirement**]." *Arctic Cat*, 876 F.3d at 1368.

*First*, Microsoft's interrogatory response does not identify any specific product that should have been marked. Instead, Microsoft responded:



*See, e.g., Am. Med. Sys., Inc. v. Med. Eng'g Corp.*, 6 F.3d 1523, 1539 (Fed. Cir. 1993) ("*AMS*") (explaining that marking usually does not apply where only method claims are asserted because "**there is nothing to mark**," but where both apparatus and methods claims are asserted marking is required only "**to the extent there is a tangible item to mark**"; holding marking was required based on the facts at issue because "**there was a physical device produced by the claimed method that was capable of being marked**"); *Akamai Techs., Inc. v. Limelight Networks, Inc.*, No. 06-11109-RWZ, 2008 WL 697703, at *1 (D. Mass. Feb. 8, 2008) (finding no limitation on past damages for failure to mark if there is no tangible article covered by the patent capable of being marked, such as a system **consisting of software and internal computers not accessible to customers or potential infringers**) (citing *AMS*, 6 F.3d at 1539); *Limelight Networks, Inc. v. XO Communications, LLC*, 241 F. Supp. 3d 599, 608 (E.D. Va. 2017) (Content Delivery Network servers did not contain a tangible item that could be marked and thus was "not a 'patented article'

as contemplated by 35 U.S.C. § 287").

███████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████ Microsoft was required to identify a specific product or device, *i.e.*, a tangible article, that should have been marked with patent numbers to satisfy *Arctic Cat's* initial burden of production. It did not do so. That failure alone forecloses Microsoft's attempt to limit pre-suit damages as a matter of law. *See, e.g.*, *Zeiss A.G. v. Nikon Corp.*, No. 2:17-CV-07083, 2018 WL 5078256, at *3 (C.D. Cal. Oct. 4, 2018) (applying *Arctic Cat* and granting a one-paragraph summary judgment motion for patent owner because during discovery the accused infringer failed to meet its burden of production by not identifying unmarked patented articles it believes practice the invention).

*Second*, Microsoft's interrogatory response does not identify any product whatsoever that **Microsoft** believes or alleges are unmarked 'patented articles' required to be marked under § 287(a). *Arctic Cat*, 876 F.3d at 1368 ("believes") and 1369 ("alleges"). To the contrary, Microsoft only alludes to an unspecified contention of IPA. But that does not satisfy Microsoft's burden of production to identify specific unmarked products that Microsoft believes and alleges are covered by the Asserted Patents. *See id*. "Federal Circuit precedent is clear that it is [the accused infringer] that bears the initial burden of producing answers to these questions." *Altair Logix LLC v. Asus Computer Int'l*, 18-CV-04985-HSG, 2019 WL 1117535, at *3 (N.D. Cal. Mar. 11, 2019).

███████████████████████████████████████████████████████

███████████████████████████████████████████

████████████████ And IPA's contention plainly cannot satisfy Microsoft's *Arctic Cat* initial burden of production to identify unmarked products that **Microsoft** believes or alleges the patents cover. *See, e.g.*, *CXT Systems, Inc. v. Academy LTD,* No. 2:18-CV-00171-RWS-RSP, 2020 WL 9936135,

at *2-4 (E.D. Tex. Jan. 28, 2020) ("CXT counters that JCP, as the alleged infringer, failed to meet its initial burden to 'put CXT on notice that CXT or its authorized licensees sold specific, unmarked products **which JCP believes practice the Asserted Patents**.' The Court agrees with CXT and finds that JCP failed to meet its initial burden regarding marking."); *see also id*. at 4.

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

In sum, Microsoft refused to do what the law requires and should not be rewarded for the deficiencies in its discovery responses. *See Pavo Sols. LLC v. Kingston Tech. Co., Inc*, No. 14-CV-01352, 2019 WL 4390573, at *2 (C.D. Cal. June 26, 2019) ("While [the accused infringer's] burden is low,…it must at least put [the patent owner] "on notice that he or his authorized licensees sold **specific** unmarked **products** which the **alleged infringer believes** practice the **patent**.") (quoting *Arctic Cat*, 876 F.3d at 1368 (emphasis added)).

### 2. Microsoft did not identify any other specific tangible product it believes should have been marked

██████████████████████████████████████████████████

███████████████ Microsoft did not identify any other specific tangible product it contends should have been marked. (Ex. LL, No. 6.) Again, Microsoft has defaulted on its *Arctic Cat* burden of production.

*Artic Cat's* express holding, putting the initial burden of production on the accused infringer, is based in part on the desire to avoid litigation gamesmanship. If Microsoft believes IPA was required to mark any specific products, ███████, it should have disclosed this

theory and the specific devices it contends should have been marked to IPA during discovery. It did not. ████████████████████████████████████████████████████

████████████████████████████████████████ Microsoft never disclosed either theory

to IPA in response to IPA's specific interrogatory.

Considering Microsoft's failure to disclose whether Microsoft contends are any specific

products required marking, the Court should foreclose Microsoft from arguing any failure to

mark at ████████████████████████████████ *See* Fed. R. Civ. P. 37(c)(1) ("If a

party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party

is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or

at a trial, unless the failure was substantially justified or is harmless."); *see also Lake Cherokee

Hard Drive Techs., L.L.C. v. Marvell Semiconductor, Inc.*, 964 F. Supp. 2d 653, 659 (E.D. Tex.

2013) (granting plaintiff's summary judgment motion on marking under Rule 37 where

defendant failed to disclose its marking theories despite the fact that plaintiff "propounded an

interrogatory expressly on marking.").

## VI. ALTERNATIVELY, IPA'S SECOND AMENDED COMPLAINT RELATES BACK TO THE FILING DATE OF IPA'S ORIGINAL COMPLAINT (01/01/2018)

Even if the Court determines some product exists that was capable of marking and should

have been marked, and that Microsoft did not default on its *Arctic Cat* initial burden of

production, it should hold that IPA is entitled to seek damages back to the filing date of its

original complaint on January 1, 2018 (D.I. 1) because IPA's Second Amended Complaint

("SAC"), deemed filed as of March 20, 2018 (D.I. 16), relates back to the original complaint's

filing date.

### A. The Federal Rules and Binding Precedent Establish that IPA's SAC Relates Back to the Filing Date of the Original Complaint

Federal Rule of Civil Procedure 15(c) provides that an amended pleading, such as a

complaint, relates back to the filing date of the original pleading when "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Fed. R. Civ. P. 15(c)(1)(B). More specifically, in a similar case, the Federal Circuit recently held an amended complaint asserting new patents related back to the filing date of the original complaint for the purpose of determining the damages period at trial. *See Anza Tech., Inc. v. Mushkin, Inc.*, 934 F.3d 1369 (Fed. Cir. 2019), *cert. denied,* 140 S. Ct. 849 (2020).

In holding that relation back to the filing date of the original complaint applied to new patents asserted in an amended complaint, *Anza* relied on "cases applying the logical relationship test in the patent context" as "particularly instructive in applying the relation back doctrine." *Id.* at 1369. The "pertinent considerations" bearing on whether claims in the amended complaint are logically related to the claims from the original complaint include: (1) the overlap of parties; (2) the overlap in the accused products; (3) the underlying science and technology; (4) time periods; and (5) any additional factors that might suggest a commonality or lack of commonality between the two sets of claims. *Id. Anza* further held that "the determination of whether newly alleged infringement claims relate back to the original complaint" is an issue governed by Federal Circuit law. *Id.* at 1366.

Moreover, this Court has recently applied and followed *Anza*. In *Shure Inc. & Shure Acquisition Holdings, Inc., v. ClearOne, Inc.*, No. CV 19-1343-RGA-CJB, 2020 WL 2839294, (D. Del. June 1, 2020), the Court considered the application of the "first to file" rule. Magistrate Judge Burke issued a report and recommendation determining that an amended complaint asserting a *design* patent relates back to the original complaint asserting a *utility* patent:

> The Court agrees with Shure that the design patent cause of action asserted in the SAC relates back to its original Complaint here, thus making this instant action the actual first-filed case. (D.I. 80 at 4-8) Each of the considerations set out in *Anza Tech.* are met here:

(1) just as with its claim of infringement as to the '493 utility patent in the original Complaint, Shure's design patent claim is brought against the same defendant (ClearOne); (2) the same accused product is at issue as to both claims (the BMA CT product), as is the same allegedly infringing activity (making, using and selling that BMA CT product); (3) both claims implicate the same microphone technology (with the ornamental features of that technology at issue as to the design patent); and (4) the design patent relies on the disclosure of the '493 patent and claims its earlier filing date.

*Id.* at *10. This Court adopted the report and recommendation. *Shure Inc. v. ClearOne, Inc.*, No.

CV 19-1343-RGA-CJB, 2020 WL 8258362 (D. Del. June 18, 2020).

**B.    All of the *Anza* Factors Support Application of the Relation-Back Doctrine from Original Complaint to the SAC in this Case**

This Court should hold as a matter of law that IPA's SAC relates back to the date of the

filing of its original complaint because all the *Anza* factors are satisfied.

**1.    *Anza* Factor 1: Overlap of parties**

IPA's original complaint and SAC both assert infringement against the same party,

Microsoft Corporation. (D.I. 1, ¶ 2 and 16, ¶ 2.) Thus, factor one supports relating IPA's SAC

back to the date of filing of the original complaint. *Anza*, 934 F.3d at 1369.

**2.    *Anza* Factor 2: Overlap of accused products and processes**

In its original complaint, IPA alleged infringement of U.S. Patent Nos. 6,742,021 and

6,523,061 (the "Halverson Patents"), identifying infringing capabilities implemented via Cortana.

(D.I. 1, ¶¶ 15-36; Exs. NN-OO.) IPA's original complaint accused Microsoft of literal

infringement under 35 U.S.C. § 271(a) for "making, using, offering for sale, selling, and/or

importing within this judicial district and elsewhere in the United States, without license or

authority, infringing products having the Microsoft Cortana digital assistant, including but not

limited to Surface, Surface Pro, Surface Book, desktops and/or laptops and/or tablets with the

Windows 10 operating system, and related products and/or processes falling within the scope of

one or more claims of the ['021 and '061] Patent[s], and the Microsoft Cortana digital assistant

itself ("Microsoft Cortana-enabled products"), including at least claim 1." (D.I. 1, ¶¶ 17, 28.) The

original complaint also alleged Microsoft infringed "by active inducement under 35 U.S.C. §

271(b)" (D.I. 1, ¶¶ 19, 30).



In comparison to IPA's original complaint, IPA's SAC accuses the same products of

infringing the newer-asserted '115 and '560 Patents (the "Cheyer Patents"). (*See, e.g.*, D.I. 16, ¶

165 (defining "Microsoft Cortana-enabled products"); ¶¶ 203-226 (SAC '115 Patent

infringement allegations identifying the same accused products as the original complaint); ¶¶

227-248 (SAC '560 Patent infringement allegations identifying the same accused products as the

original complaint).)

These facts are comparable to, if not stronger than, the overlap of accused products and

process in *Anza*. Specifically, the accused infringer in *Anza* argued, "the fact that the second

amended complaint withdrew all prior claims of infringement under the 'flip chip' '927 patent

and substituted claims from the two 'wire bonding' patents indicates that the two complaints

address entirely different bonding techniques." *Anza*, 934 F.3d at 1370. The Federal Circuit

disagreed, finding that "[w]hile the patents address different bonding techniques, they all share the same underlying technology. All three patents are focused on solving the same problem by the same solution." *Id*. The accused infringer also argued that the set of accused products changed between the original complaint and the operative amended complaint. *Id*. at 1372. But *Anza* found that six of the remaining products were accused in both complaints, and "[w]ith regard to those six products, the [] amended complaint and the original complaint would likely present closely related issues." *Id*. at 1373.

As explained above, infringement of the Halverson Patents was predicated on the use of Cortana.  Thus, factor two supports relating IPA's SAC back to the original complaint's filing date. *Anza*, 934 F.3d at 1369.

### 3.   *Anza* Factor 3: Overlap in technology

The Cheyer Patents are directed to distributed computing environments where agents are used for task completion. (Ex. PP, 1:25-33; Ex. QQ, 1:17-25.) Similarly, the Halverson Patents are related to improving distributed systems using agents to interpret, understand, find, and respond to user requests for information or services. (Ex. NN, 1:15-19; Ex. OO, 1:23-27.)

Further, both the Halverson and Cheyer patents disclose distributed, agent-based systems that provide for the interpretation, understanding, retrieval, and return of information or implementation of services requested by a user. (Ex. PP, 4:58-5:15; Ex. QQ, 4:55-5:12; Ex. NN, 2:27-43; Ex. OO, 2:35-53.)

The Halverson patents asserted in IPA's original complaint each claim priority as continuations-in-part to the '115 Cheyer Patent asserted in the SAC.[7] The newly added patents in *Anza* also claimed priority to the patent asserted in the original complaint as continuations-in-part. *Anza*, 934 F.3d at 1364. In addition to the fact that the patents in IPA's original complaint and SAC share a similar relationship to the newly asserted patents in *Anza*, here the Halverson Patents asserted in the original complaint also each explicitly state that the then co-pending Cheyer '115 patent application is "incorporated herein by reference." (Ex. NN, 1:6-13; Ex. OO, 1:6-19.)

As stated above, this Court adhered to the "liberal" relation-back standard discussed in *Anza*, when it held that a ***design*** patent in an amended complaint related back to an earlier complaint asserting a ***utility*** patent. *See Shure*, 2020 WL 2839294 at *10 ("both claims implicate the same microphone technology (with the ornamental features of that technology at issue as to the design patent)".) The connection between the Cheyer and Halverson patents is equally strong, if not stronger, than the connection between patents in *Shure*. Thus, factor three supports relating IPA's SAC back to the date of the original complaint. *Anza*, 934 F.3d at 1369.

### 4.   *Anza* Factor 4: Overlap in time periods

The Cheyer and Halverson Patents all expired on January 5, 2019. Thus, the damages

---

[7] The '560 Cheyer Patent asserted in the SAC is a continuation of the '115 Cheyer Patent. Thus, the specifications of these two Cheyer Patents first asserted in the SAC are virtually identical.

period for the original complaint runs from December 16, 2016 to January 5, 2019 (excluding recovery of past damages under 35 U.S.C. § 286 as addressed in the previous section related to marking and *Arctic Cat*). As a result, here—as in *Anza*—the damages period for the SAC "is wholly encompassed within the first" and thus cannot "be regarded as distinctly different from the first." *Anza*, 934 F.3d at 1372. The damages period for the SAC would be the same as the damages period in the original complaint if the relation-back doctrine is applied. Thus, factor four supports relating IPA's SAC back to the date of filing of the original complaint. *Id*. at 1369.

### 5. *Anza* Factor 5: Additional considerations

As discussed above, the '115 Cheyer Patent is the original patent to which all the Cheyer and Halverson Patents claim priority. Further, all the Cheyer and Halverson patents incorporate by reference the '115 Patent—also referred to as Application No. 09/225,198—making the '115 Cheyer Patent part of the intrinsic record and disclosure of all the Halverson and Cheyer patents. In *Shure*, the fact that the newly asserted design patent "relied on the disclosure of the '493 [utility] patent and claims its earlier filing date" supported relating the amended complaint at issue back to the date of the original complaint. *Shure*, 2020 WL 2839294 at *10.

These additional facts under factor five support relating IPA's SAC back to the date of filing of IPA's original complaint.

## VII. THE COURT SHOULD EXCLUDE DR. BECKER'S FLAWED REASONABLE ROYALTY CALCULATIONS BASED ON ███████████████

Courts have frequently held that an expert cannot "ignore relevant evidence by cherry-picking the facts which conform to a desired outcome." *360 Mortgage Group, LLC v. Homebridge Fin. Services, Inc.*, No. A-14-CA-00847-SS, 2016 WL 6075566, at *4 (W.D. Tex. Apr. 22, 2016) (excluding expert whose "methodology is unreliable, both because of the facts they chose to include as well as those they chose to ignore"); *see also ePlus, Inv. V. Lawson*

*Software, Inc.,* 700 F.3d 509, 522-23 (Fed. Cir. 2012) (affirming exclusion of opinion regarding reasonable royalty rate where expert "ignored the settlements that produced smaller rates" despite their greater relevance); *Barber v. United Airlines, Inc.*, 17 Fed. Appx. 433, 437 (7th Cir. 2001) ("Because in formulating his opinion [the expert] cherry-picked the facts he considered to render an expert opinion, the district court correctly barred his testimony because such a selective use of facts fails to satisfy the scientific method and Daubert, and it thus fails to 'assist the trier of fact.'"); *Guzman v. State Farm Lloyds*, 456 F. Supp. 3d 846, 853 (S.D. Tex. Apr. 27, 2020) (excluding expert testimony because "[a]n expert may not disregard without cause facts which are unfavorable to his opinion."); *Lust v. Merrell Dow Pharms.*, 89 F.3d 594, 596 (9th Cir. 1996) (affirming exclusion when the expert "'pick[ed] and chose' … from the scientific landscape and present[ed] the Court with what he believes the final picture looks like"). Here, Dr. Becker cherry-picks █████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

Dr. Becker should not be permitted to present conclusions to the jury based on cherry-picked consideration to artificially drive down his reasonable royalty. *See Guile v. United States*, 422 F.3d 221, 227 (5th Cir. 2005) (finding that where a challenged expert opinion "is fundamentally unsupported, then it offers no expert assistance to the jury.").

██████████████████████████████████████████████

████████████████████████████████████

## VIII. THE COURT SHOULD EXCLUDE DR. LIEBERMAN'S AND DR. BECKER'S OPINIONS CONCERNING NON-INFRINGING ALTERNATIVES

On August 27, 2019, IPA asked Microsoft to identify all products and/or systems that it contends constitute a non-infringing alternative ("NIA") to the Asserted Patents:

> Identify with specificity, on a claim-by-claim basis, each system and/or method that you contend constitutes an acceptable, non-infringing alternative to the methods and systems claimed by the Asserted Claims of the Patents-in-Suit, as of the earliest date that you began offering, providing and/or selling the Accused Products, or offering, providing, or selling the Accused Instrumentalities for use in the Accused Products. Include the complete factual basis for your response, including the identity of each individual with personal knowledge regarding noninfringing alternatives, the identity of each person whose knowledge, information and/or documents were sought or consulted in answering this interrogatory, and the identity and Bates number of each document that includes information relevant to non-infringing alternatives or any aspect thereof.

(Ex. XX.)

Microsoft's sole substantive response read: "the Accused Products in their current state are non-infringing and therefore no alternative is needed." In other words, Microsoft declined to identify any NIAs. Then, two weeks *after* the close of fact discovery, and *four years after* IPA initially requested such information, Microsoft, for the first time, identified purported NIAs:

> the techniques found not to infringe during IPA's litigation against Amazon is a non-infringing alternative as to every claim. Moreover, each claim of the Asserted Patents rendered unpatentable by the PTAB during IPR proceedings is also a non-infringing alternative. ██████████████████████████████ are also non-accused, non-infringing alternatives to the alleged inventions claimed in the Asserted Patents.

(Ex. YY.) In his expert report, Microsoft's technical expert, Dr. Lieberman, offers conclusory and undeveloped opinions concerning alleged NIAs. (Ex. ZZ, ¶¶ 424-428.) Likewise, Microsoft's damages expert, Dr. Becker, utilizes these alleged NIAs in his hypothetical negotiation analysis. (Ex. RR, ¶¶206-208.)

Microsoft has no excuse for failing to disclose NIAs before the close of fact discovery. The Federal Rules obligate Microsoft to respond to IPA's interrogatories during fact discovery and provide prompt supplementation. Fed. R. Civ. P. 26(e)(1). And the Federal Rules penalize failure to do so: The offending party "is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or harmless." Fed. R. Civ. P. 37(c). The advisory committee notes emphasize that this "self-executing" and "automatic" sanction" provides a strong inducement for disclosure of material that the disclosing party would expect to use as evidence. *Id*., Advisory Committee Note (1993).

Further, contention interrogatories "serve an important purpose in helping to discover facts supporting the theories of the parties." *Woods v. DeAngelo Marine Exhaust, Inc.,* 692 F.3d 1272, 1280 (Fed. Cir. 2012). Because contention interrogatories can evolve as a case progresses, "Rule 26(e) requires that as theories mature and as the relevance of various items of evidence changes, responses to interrogatories, and particularly contention interrogatories, can be corrected or supplemented to reflect those changes." *Id*. Courts regularly strike portions of expert reports that contain theories not disclosed in interrogatory answers. *See Innogenetics, N.V. v. Abbott Labs.,* 512 F.3d 1363, 1376 n.4 (Fed. Cir 2008) ("[E]leventh hour disclosures . . . without compliance with Rule 26 violate both the rules and principles of discovery, and the obligations lawyers have to the court. Exclusion and forfeiture are appropriate consequences to avoid repeated occurrences of such manipulation of the litigation process."); *Semcon IP Inc. v. MediaTek Inc*., No. 2:16-CV-00437-JRG-RSP, 2018 WL 4501871, at *5 (E.D. Tex. Feb. 28, 2018) (striking secondary considerations not disclosed during discovery from expert report).

Courts in the Third Circuit consider the *Pennypack* factors in determining whether a failure to disclose was harmless: "(1) the prejudice or surprise to the party against whom the evidence is offered; (2) the possibility of curing the prejudice; (3) the potential disruption of an

orderly and efficient trial; (4) the presence of bad faith or willfulness in failing to disclose the evidence; and (5) the importance of the information withheld." *TQ Delta, LLC v. ADTRAN, Inc.*, No. CV 14-954-RGA, 2019 WL 4346530, at *1 (D. Del. Sept. 12, 2019) (citing *Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 719 (3d Cir. 1997)). Further, this Court has observed that in "'sophisticated, complex litigation involving parties represented by competent counsel,' courts have been less indulgent in applying the *Pennypack* factors and 'more willing to exclude evidence without a strict showing that each of the *Pennypack* factors has been satisfied.'" *TQ Delta, LLC v. 2Wire, Inc.*, No. CV 13-1835-RGA, 2021 WL 3202077, at *3 (D. Del. July 28, 2021) (quoting and citing *Bridgestone Sports Co. v. Acushnet Co.*, No. CIVA 05-132 JJF, 2007 WL 521894, at *4 (D. Del. Feb. 15, 2007). Here, all the *Pennypack* factors support exclusion.

For the first *Pennypack* factor, IPA was unaware of Microsoft's NIA theories during discovery and deprived of the opportunity to take relevant discovery of Microsoft fact witnesses during the discovery period set by the Court. Additionally, despite serving interrogatories directly related to NIAs, IPA also sought to discover any NIA theories through a Rule 30(b)(6) deposition, but Microsoft refused to designate a witness. (Ex. AAA, pp. 33-34.) IPA was undeniably prejudiced by Microsoft's actions and gamesmanship. *See TQ Delta*, 2021 WL 3202077, at *3 (first *Pennypack* factor satisfied where defendant was unaware of doctrine of equivalents "theory during discovery and, therefore, was deprived of the opportunity to discover information pertaining to this theory and to prepare appropriate defenses.").

For the second and third *Pennypack* factors, there is no possibility of curing the prejudice to IPA as fact and expert discovery are closed and the parties are approaching trial. This case has been pending since 2018, with trial scheduled for May 2024. Reopening discovery would disrupt the trial schedule for a case that has already been pending for several years. *See Johns Hopkins Univ. v. Alcon Lab'ys, Inc.*, No. CV 15-525-SLR-SRF, 2018 WL 11424700, at *26 (D. Del. Apr.

5, 2018), *report and recommendation adopted,* No. CV 15-0525, 2018 WL 11424387 (D. Del. Apr. 25, 2018) (*Pennypack* factors satisfied where "JHU has no opportunity to cure the prejudice given that fact and expert discovery are closed, and trial is quickly approaching, and reopening this issue for further discovery would disrupt the trial schedule.").

For the fourth *Pennypack* factor, one of the theories Microsoft identifies ███████ ████████████████████████████████████████ As part of the discovery process, IPA identified a topic directed to NIAs, but Microsoft stated that it would not produce a witness to testify on NIAs. (Ex. AAA, pp. 33-34.) Despite not answering IPA's NIA interrogatory and refusing to present witnesses on NIAs, Microsoft then sprang NIAs in its expert report. Courts do not tolerate litigation-by-ambush tactics.

For the fifth *Pennypack* factor, Microsoft does not rely heavily on the NIAs in the Lieberman or Becker reports. As such, it is not a central part of Microsoft's case, and precluding evidence of NIAs will not leave Microsoft defenseless. (Ex. BBB, 256:1-257:17 (Microsoft's expert acknowledging he is just repeating what Microsoft's counsel told him regarding NIAs).) *See also ViaTech Techs., Inc. v. Microsoft Corp.*, No. CV 17-570-RGA, 2021 WL 663057, at *2 (D. Del. Feb. 19, 2021) (excluding late disclosed theory that had "some importance" to plaintiff's infringement theory, but "not so important that any of Plaintiff's literal infringement theories are being discarded.") If NIAs were vital to its case, Microsoft would have spent more time developing such theories and they would feature more prominently in Microsoft's expert reports. *See Johns Hopkins Univ. v. Alcon Lab'ys, Inc.*, No. CV 15-525-SLR-SRF, 2018 WL 11424700, at *26 (D. Del. Apr. 5, 2018), *report and recommendation adopted,* No. CV 15-0525, 2018 WL 11424387 (D. Del. Apr. 25, 2018) ("fifth factor does not weigh heavily in [non-movant's] favor, given that [non-movant] would have presumably advanced the Packo reference as a primary reference earlier in discovery if the reference was crucial to its obviousness defense.").

Exclusion is an appropriate sanction for Microsoft's failure to comply with discovery rules regarding its alleged NIAs. *See Innogenetics, N.V. v. Abbott Lab'ys*, 512 F.3d 1363, 1376 (Fed. Cir. 2008) ("Conclusory expert reports, eleventh hour disclosures, and attempts to proffer expert testimony without compliance with Rule 26 violate both the rules and principles of discovery, and the obligations lawyers have to the court. Exclusion and forfeiture are appropriate consequences to avoid repeated occurrences of such manipulation of the litigation process."). Accordingly, IPA respectfully requests that the Court preclude Microsoft and its experts from providing testimony regarding NIAs. *See Freeny v. Murphy Oil Corp.*, No. 2:13-CV-791-RSP, 2015 WL 5144347, at *3 (E.D. Tex. June 4, 2015) (precluding testimony regarding "design-around option" that was not disclosed during discovery); *Prism Techs., LLC v. T-Mobile USA Inc.*, No. 12-124, 2015 WL 5883764, *3 (D. Neb. Oct. 8, 2015) (excluding portions of expert reports relying on undisclosed information concerning non-infringing alternatives); *SynQor, Inc. v. Artesyn Tech., Inc.*, No. 07-497, 2011 WL 3625036, *11 (E.D. Tex. Aug. 17, 2011) (same).

Finally, Dr. Lieberman's NIA opinions should be excluded because he improperly shifts the burden to IPA. As the defendant, Microsoft bears the burden of proving the availability of any NIAs. *See Pavo Sols. LLC v. Kingston Tech. Co., Inc.*, No. 8:14-CV-01352-JLS-KES, 2019 WL 8138163, at *21 (C.D. Cal. Nov. 20, 2019), *aff'd*, 35 F.4th 1367 (Fed. Cir. 2022) (citing *Grain Processing Corp. v. Am. Maize Products*, 185 F.3d 1341, 1354 (Fed. Cir. 1999); *LaserDynamics, Inc. v. Quanta Computer, Inc.*, No. 2:06- CV-348, 2011 WL 197869, at *3 (E.D. Tex. Jan. 20, 2011)). Dr. Lieberman does not purport to establish the availability of any NIA and instead states that because IPA's expert ███████████████████████████████████████████████████████ I conclude that those systems must not infringe." (Ex. ZZ, ¶426.) Likewise, he opines, "I understand that the Court has already finally determined that the Alexa system does not infringe. I accept that conclusion, as I believe I must." (Ex. ZZ,

¶427.) However, for neither alleged NIA does Dr. Lieberman satisfy Microsoft's burden of establishing the availability of the NIA, nor does he offer a detailed or cogent explanation of his opinions and particularly how such NIAs could be implemented within Cortana to avoid infringement. In other words, Dr. Lieberman's opinion is not based on any scientific, technical, or other specialized knowledge that would aid the jury. *See* Fed. R. Evid. 703. Therefore, this provides an independent basis for excluding Dr. Lieberman's NIA opinions, and the exclusion of Dr. Lieberman's opinion carries over to Dr. Becker's opinions.

## IX. CONCLUSION

For the foregoing reasons, IPA respectfully requests the Court:

(1) Find that the printed publication references Microsoft uses to comprise the "CNET OAA System" and the "Warren Implementation of RETSINA System" are subject to IPR estoppel under 35 U.S.C. § 315(e)(2) and cannot be relied upon at trial;

(2) Exclude Dr. Sycara's opinions relating to inventorship;

(3) Exclude Dr. Sycara's opinions relating to public availability of relevant SRI source code;

(4) Find that Microsoft defaulted on its *Arctic Cat* burden of production and preclude Microsoft from arguing failure to mark at trial;

(5) Find that IPA's Second Amended Complaint relates back to the filing date of its Original Complaint;

(6) ███████████████████████████████████████████████████████████████ ███████ and

(7) Exclude all expert opinions and trial testimony relating to non-infringing alternatives.

Dated: November 22, 2023

Of Counsel:

Paul J. Skiermont
Jaime K. Olin
Steven W. Hartsell
Kevin P. Potere
Todd A. Martin
SKIERMONT DERBY LLP
1601 Elm Street, Suite 4400
Dallas, TX 75201
(214) 978-6600
pskiermont@skiermontderby.com
jolin@skiermontderby.com
shartsell@skiermontderby.com
kpotere@skiermontderby.com
tmartin@skiermontderby.com

Mieke K. Malmberg
SKIERMONT DERBY LLP
633 West 5th Street, Suite 5800
Los Angeles, CA 90071
(213) 788-4500
mmalmberg@skiermontderby.com

BAYARD, P.A.

*/s/ Stephen B. Brauerman*
Stephen B. Brauerman (#4952)
600 North King Street, Suite 400
Wilmington, DE 19801
(302) 655-5000
sbrauerman@bayardlaw.com

*Attorneys for Plaintiff,*
*IPA Technologies Inc.*